# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

THE ASSETS REALIZATION COMPANY

*v.*

FERDINAND H. HEIDEN *et al.*

*Opinion filed April 17, 1905.*

1. MORTGAGES—*in absence of express provision, evidence which shows the assumption of mortgage must be clear.* A purchaser of mortgaged property may assume the mortgage debt according to the terms of the mortgage without its being expressly so provided in the deed, but in the absence of an express provision the evidence must clearly show the assumption was in fact made.

2. LOAN ASSOCIATIONS—*when doctrine of ultra vires will not be applied.* If a contract between a loan association and a borrower is *prima facie* within the charter powers of the association, is not prohibited by law nor *malum in se* and has been fully performed by the borrower, nothing remaining to be done except to release the mortgage, the doctrine of *ultra vires* will not be applied to compel the borrower to pay more money than his contract calls for in order to obtain the release.

3. SAME—*when provision of statute for continuing payments until they reach maturity value of stock does not apply.* The provision of section 6a of the Loan Association act of 1897, (Laws of 1897, p. 168,) that "payment of dues shall continue on each share until the same shall have reached maturity value," does not apply to a contract which was fully performed by the borrower according to his agreement, a release demanded and suit begun to foreclose the mortgage before the said enactment was in force.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

This was a foreclosure proceeding instituted in the circuit court of Cook county, in which the International Building, Loan and Investment Union, a corporation, sought to foreclose two trust deeds executed to secure indebtedness to said corporation. The original trust deeds were executed by Charles A. Linke and wife, who subsequently conveyed the premises therein described, to secure said loan, to one Jeneka Wetterhahn, and by her they were conveyed to her son, and by him thereafter conveyed to appellee Heiden subject to said encumbrances, and also subject to certain other encumbrances made by Wetterhahn during his ownership of the premises.

The original bill was filed June 19, 1896. Subsequently, about April 27, 1900, Ira M. Cobe, by leave of the court, filed an amended bill of complaint, in which he states that in a suit wherein the People of the State of Illinois *ex rel.* James S. McCullough, Auditor of Public Accounts, were complainants and the International Building, Loan and Investment Union was defendant, a decree was entered declaring said union to be insolvent, dissolving said corporation and appointing permanent receivers. It is further shown that said receivers subsequently sold all the assets and property of said corporation to said Cobe, and that such sale was confirmed by the court on the 23d day of February, 1900, by reason of which proceedings it is alleged appellee Heiden became indebted to said Cobe for the amount claimed to have been due the union, which amount is claimed to be $6605.56. The International Building, Loan and Investment Union will hereafter, for brevity, be called "union." By a subsequent petition the Assets Realization Company, a New Jersey corporation, it is said, authorized to do business

in Illinois, shows that said Ira M. Cobe sold and transferred to it the notes and mortgages in controversy and that it is now the legal holder thereof, and by leave of court it filed a supplemental bill praying for a decree of sale and foreclosure.

The applications for the loans in controversy were made on a form in part as follows: "I do hereby make application for a loan of $5000 for six years, to bear interest at the rate of five per cent per annum, payable on or before the last Saturday of each month, all payments to be paid at such place as the lender may direct, and to secure the same agree to give a mortgage on the real estate set forth in the following." The note given for said loan is as follows:

"Chicago, Illinois, *December 2nd, 1889.*

"Six years after date, for value received, we promise to pay to the order of the International Building, Loan and Investment Union, a corporation duly organized under the laws of the State of Illinois, the sum of $5000, with five per cent interest per annum, and also five per cent premium, (bid thereon to secure this loan under the by-laws of said company,) each payable monthly, on or before the last Saturday of each month, principal, interest and premium payable at the office of the International Building, Loan and Investment Union at Chicago, Illinois. Any failure to pay interest or premium when due may make principal, interest and premium at once due, and any waiver of such right shall not prevent the payee from enforcing this right upon any recurrence of the default.

$5000.00.                                    Charles A. Linke,
                                            Emilie Linke."

On the face of the note is an endorsement signed by the receivers of the union, which is as follows: "The maker of this note is entitled to a credit hereon of 703 13/100 dollars, being in full and complete satisfaction and discharge of the entire distributive interest and share of the said maker as a stockholder in the International Building, Loan and Investment Union." This amount so endorsed was realized from the sale, by the receivers, of the assets of the union to appellant's assignor, including the notes now in controversy, by virtue of an order of the superior court made in the suit wherein the corporation was dissolved, that court directing the receivers to endorse on the note of each borrowing stock-

holder of the union a credit of twenty-five per cent of the amount paid by such shareholder as installments on his shares of stock, in full and complete satisfaction of the entire distributive interest of said borrowing stockholder in and to the property and assets of said union. There was a subsequent loan and note for $1000, made February 1, 1890, and secured under similar terms and conditions, between the same parties and on the same property, which is also involved in these foreclosure proceedings.

The statute provides (Homestead Loan Association act, chap. 32, sec. 2,) that as soon as one hundred shares or more of capital stock in a mutual building, loan and homestead association shall be subscribed, the commissioners shall convene a meeting of the subscribers for the purpose, among other things, of adopting a charter and by-laws. In the present case the charter and by-laws provide as follows in section 2: "Its object is to afford its members a safe and profitable investment for their savings, to facilitate the purchase and improvement of real estate and provide the advantages usually expected from savings banks and other institutions of like character." Section 3 of article 13 provides, in part, that "on all loans made by this union to a shareholder, said shareholder shall pay an interest of five per cent per annum and a premium of five per cent per year on said loans." Section 1 of article 12 provides that "the terms and conditions expressed in the certificate of stock, in connection with the application for membership and the by-laws of this association, form the contract between this union and each shareholder therein." Section 14 of article 13 provides that "all shareholders shall pay, or cause to be paid, a monthly installment of seventy-five cents on each share named in his certificate until the same shall be fully paid," which is to form part of the loan fund. In section 20 it is provided that "the union reserves the right to mature any certificate at any time after one year, and to issue a paid-up certificate of shares payable at maturity of stock, with in-

terest at six per cent per annum or at the maturity of stock in pledge, payable at time of maturity of loan."

In the certificate of stock issued to its shareholders at the time the loans in controversy were made, the union agreed to pay said shareholder, his heirs or assigns, "the sum of $100 for each of said shares at the end of six years," upon conditions as stated in the by-laws,—that is, the payment of seventy-five cents per month on each share during continuance of the contract,—that is, during the six years. Each certificate had printed on its back the charter and by-laws as part of the contract.

In December, 1895, the union received a communication from the State Auditor of Public Accounts, stating that an examination of its affairs disclosed that its methods of maturing stock were contrary to law, in that no building association had "a right legally to undertake to mature stock at a specified time, and that in doing so the authority granted such institutions by law is exceeded." The union was therefore requested to mature stock "only when the amount of payments made thereon, together with the profits apportioned thereto, equal the sum of $100 per share," and was notified that failure to observe this request would result in legal steps "likely to be disastrous to the association." This action was taken under section 17 of the act of 1893, and the association issued notice to its shareholders that it would obey the Auditor's instructions.

The master to whom this cause was referred to take the evidence and report his conclusions found appellee indebted on the original notes $7885.09. He found, however, that the officers of the union were, at the time of the transfer of the mortgaged property to Heiden, conducting its business illegally in maturing stock arbitrarily within six years, and that the provisions of the notes in suit that the principal amounts therein named should be paid in six years were void; also, that the provisions in the charter and by-laws that a borrowing stockholder should pay interest at the rate

of five per cent per annum and a premium of five per cent per annum were at that time (prior to the amendment in force June 16, 1891, to section 8 of chapter 32,) void. The master also found that there was no competitive bidding for a preference for said loans when made, and that therefore the contract as to payment of premium was usurious. He concluded, however, that this defense cannot be made by any one but the original maker of the notes, his immediate grantee having assumed and agreed to pay the notes as a part of the purchase price, the appellee Heiden having deducted from the purchase price all of the premiums and sums constituting all of the payments which were to be made on said loans. In a supplemental report the master further found, from the evidence, "that said union received deposits of money from its stockholders and paid interest on the same at the rate of six per cent per annum if left on deposit for a period of six months, and that it had a large number of agents soliciting such deposits and paid them commissions of about two per cent for obtaining the same, and that said union sold what purported to be paid-up stock at $55 per share, upon which it agreed to pay its holder $100 at the expiration of six years from the date of its issue and paid its agent a commission of seventy-five cents per share for selling said paid-up stock, and that none of said acts were authorized by its charter and by-laws or by the laws of the State of Illinois." The master recommended a decree for the amount found by him.

Objections were filed to the master's report, which were ordered to stand as exceptions. After the hearing by the chancellor they were sustained and a decree was entered finding, in part, as follows: "The court further finds that the two notes and two trust deeds or mortgages for the sum of $5000 and $1000, respectively, and all accrued indebtedness thereon, described in said bill of complaint and other pleadings in this cause, have been fully paid, satisfied and discharged and are no longer liens upon the premises in the

said trust deeds or said mortgages described. It is further ordered, adjudged and decreed that said bill of complaint herein, the said supplemental and amended bills of complaint and the amendment to said supplemental and amended bills herein be dismissed out of this court for want of equity, and they are hereby dismissed accordingly." From this decree an appeal was prosecuted to the Appellate Court. A judgment was entered in that court affirming the decree of the circuit court, and a further appeal is now prosecuted to this court.

S. W. Swabey, for appellant.

J. Henry Kraft, and Emil A. Meyer, for appellees.

Mr. Chief Justice Ricks delivered the opinion of the court:

The union was incorporated under the Homestead Loan Association act of 1879, but did not pretend to follow the law with reference to making loans, issuing or selling stock, or in scarcely any other of its many features. The loans as made by the union upon the property in question were in direct violation of the spirit but not the letter of the act in providing that seventy-two payments would entitle the borrower's stock to mature, and in violation of both the letter and spirit of the act in arbitrarily fixing the amount of interest and premiums by the by-laws and without letting the money by competitive bids, which latter was required by section 8 of the act then in force. It paid its officers, agents, solicitors, collectors, etc., salaries and commissions in violation of the statute; did a banking business; received money on deposit and paid six per cent interest thereon; issued paid-up stock for $55 per share, the face value payable in six years; compelled a retirement of stock without any cash payment by issuing a certificate for the amount that had been paid, due at the end of the six-year period, with six per

cent interest; did not recognize the statutory right of withdrawal except in case of the death of the stockholder, and was devoid of every feature of mutuality that was intended to obtain in such associations. Practically every item that stood on the credit or debit side of its ledger was in violation of the statute under which it was incorporated and pretended to do business.

Section 2 of the act required that the by-laws of the association should be adopted before the charter was granted, and that a copy of the same should accompany the report of the commissioners to the Secretary of State upon which the certificate of incorporation was issued. That was done in the case at bar. The by-laws then were passed by the stockholders, and the objectionable features above mentioned were all provided for in the by-laws. By section 1 of article 12 it was provided that "the terms and conditions expressed in the certificate of stock, in connection with the application for membership and the by-laws of this association, form the contract between this union and each shareholder therein." The shareholder had to make written application for membership, in which he agreed to be bound by the by-laws, and each certificate of stock had printed thereon and made a part thereof a copy of the by-laws, and, in addition to the by-laws, certain conditions and stipulations, which were alleged to be, and admitted by the shareholders to be, binding upon the union and the shareholder. The first material provision was as to the payment or maturity of the stock, and was: Said union "agrees to pay to said shareholder * * * the sum of $100 for each of said shares at the end of six years from the date hereof, or, in case of his death prior to the expiration of such six years, the union will pay the sum of all monthly installments paid on this certificate, with interest at six per cent per annum, payable in the manner and upon the conditions set forth in said terms, conditions and by-laws hereto attached." The first condition attached to the share of stock was, that payments should be made in

monthly installments of seventy-five cents on each share named in the contract. The third was, that the union would issue a paid-up certificate for the amount of all monthly installments paid on shares that had been in force one year or over, payable at the maturity of the stock, with interest at six per cent. The twelfth was, that upon the maturity of the stock each shareholder was to pay into the reserve fund five per cent of the par value of the share. The thirteenth was as follows: "The said shareholder shall not have any claim to any interest in the affairs, assets or funds of this union, nor the control of them, except as above specifically set forth, and assumes no further liability of any kind whatsoever except as herein described." Section 21 of article 13 of the by-laws contained this provision: "And it is hereby expressly agreed between all shareholders in this union, that a payment of $100 per share named in his or her certificate that has been in force six years shall be accepted as full pay of all claims on their certificate or against this union."

The membership fee was fixed at $10 for ten shares and one dollar per share in addition thereto, and two dollars per share was charged for the transfer of stock. The reserve fund, from which a large,—in fact the largest,—source of revenue of the association was derived, seems to have been regarded as the sole and separate property of the union, in which the stockholder had no interest, right or concern. The union did practically nothing but borrow money and loan the same at usurious rates of interest, without any pretense of complying with the law in reference to homestead associations. The record shows that in the last year of its existence, from April 1, 1895, to April 1, 1896, it received on deposit $271,457.27, that it distributed deposits to the amount of $273,665.52 and that it retained money on deposit amounting to $57,427.92; that the total amount received for monthly dues amounted to $274,738.24, and that it paid out by way of interest $26,493.87; that between March 31, 1895, and April 1, 1896, it paid on shares of stock which it declared

215—2

matured upon the seventy-two or seventy-five payment plan, $314,910. It showed two kinds of stock, called "current stock," payable in six years, and "paid-up stock," payable in the same period of time. These, together with the deposits received by it, were its sources of revenue, except that by its system of enforced retirement of stock, which it reserved the right to do at any time after one year from issue, and in any and all cases by issuing its certificate payable at the expiration of the six-year period for the amount paid by the shareholder, with six per cent interest. These were in the nature of enforced loans, which the evidence shows the company could, and did, avail itself of.

It will thus be seen that although chartered as a homestead loan association, when its real nature is looked into and the actual method in which it did its business is brought to light, the union bore little, if any, resemblance to one; and it also appears that by the terms of his membership and the conditions and provisions on each certificate of stock, every stockholder was notified and fully apprised of its method of doing business.

Linke, the original borrower, solicited and obtained the first loan of $5000 on December 2, 1889, and the second loan upon the same property of $1000 on February 1, 1890. To obtain the first loan he paid a $50 membership fee, and $250 was deducted for the so-called reserve fund, so that he, in fact, received $4700; and on the $1000 loan he paid $10 membership fee and $50 to the reserve fund and received $940. By the note the maker agreed to pay, six years after date, the amount borrowed, with five per cent interest and five per cent per annum in monthly payments until maturity, and the mortgages provided for the payment of $41.70 on the $5000 loan and $8.35 on the $1000 loan on the last Saturday of each month. On August 12, 1892, Linke conveyed the mortgaged premises to Jeneka Wetterhahn, and the latter accepted a deed for the same stating it was subject to the two mortgages to the union, and which she assumed to pay

as a part of the purchase money, "according to the terms and conditions in said trust mortgage and said trust deed." At the time Linke conveyed he had paid all the monthly payments, both upon the loan and the stock, as they had matured. On October 4, 1893, Jeneka Wetterhahn conveyed the premises to Samuel Wetterhahn by warranty deed containing no conditions and without mentioning the encumbrances to the union. The consideration was $2000, for which Samuel, the purchaser, made a mortgage back to Jeneka on the premises, and later Samuel Wetterhahn made another mortgage to Jeneka Wetterhahn for $650. On the 6th of February, 1894, Samuel Wetterhahn conveyed the premises to the appellee Ferdinand Heiden. The consideration expressed in the deed was $9000. The deed recited that the purchase was subject to the two mortgages made by Linke to the union and the two mortgages made by Samuel Wetterhahn to Jeneka Wetterhahn, but there was no express assumption of the debt. Samuel Wetterhahn had become three or four months in arrears to the union at the time he made the sale to Heiden. Although the deed to Heiden stated the consideration to be $9000, the evidence, beyond question, shows that the actual consideration was $6500, and that that consideration of $6500 was made up as follows: $474.16 of arrears to the union; $2650 of the two mortgages to Jeneka Wetterhahn; between $1300 and $1400 in cash paid to Wetterhahn by Heiden, and the following payments thereafter to accrue to the union: Upon the loans, twenty-one on the $5000 loan, amounting to $79.20 each, and twenty-four upon the $1000 loan, amounting to $15.84 each. The $79.20 item consisted of $41.70 interest and premium on the $5000 loan and $37.50 monthly dues on the stock, and the $15.84 item consisted of $8.34 interest and premium on the $1000 loan and $7.50 monthly dues on the stock.

A purchaser may assume a mortgage indebtedness according to the terms of the mortgage without it being ex-

pressly so provided in the deed of conveyance, but in the absence of the written assumption the evidence must be clear and show that the assumption was in fact made. In the case at bar it is evident from what has been above said and as appears from the record that all that was assumed by Heiden was the payment of the necessary number of monthly installments to make the whole number paid seventy-two. This fact is further supported and rendered quite convincing by another circumstance established by the evidence. Before the trade was made and the terms agreed upon, Heiden and his attorney, and Samuel Wetterhahn and his attorney, and one Emil Meyer, went to the office of the union to ascertain the condition of the loan and the amount remaining to be paid. There they met Richardson, the secretary, and one Riedel, and asked of the status of the two loans. The secretary figured up the amount required to pay the loan at that time and withdraw the stock, and also stated the number of monthly payments required to pay out each loan if the loan was permitted to stand, and exhibited to the men there making the inquiry a recent statement and circular of the union showing the number of loans that had been paid and matured on the seventy-two payment plan, and stated to the parties that whenever seventy-two payments were made the respective mortgages would be released. Relying upon these statements and representations of the officers of the union, Heiden agreed to and did take the property and paid the arrears of interest, premiums and dues, and from that time made the payments as they fell due. In December, 1895, after the Auditor had informed the union that it could not lawfully mature its stock by any given number of payments, the union adopted a by-law or resolution requiring that seventy-five payments be made to mature the stock. Complying with this latter resolution or by-law, Heiden paid the additional payments until seventy-five payments were made upon the stock and seventy-two payments on interest and premium on the loan. About the time he did

this the officers changed, and he demanded of the new officers the release of the trust deeds. Linke and his grantees actually paid to the union upon the $5000 loan, upon which he received but $4700, $5814.90, or $1114.90 more than he received, being a sum. equal to seven and eight-tenths per cent per annum on the amount received, on the basis of partial payments; and in same proportion was the $1000 loan paid. From this state of facts the chancellor concluded that the loan had been fully paid. Appellant controverts this proposition, and contends that the loan was not fully paid, and could not be fully paid until the surplus earnings of the stock and the proportionate share of the revenue of the union were sufficient to mature the stock and pay the loan.

It may first be said that the stockholders did not participate in the earnings of any stock other than their own; that the stock of the association was not issued in series, but all as one series, with a continuous numerical number. A simple mathematical calculation will demonstrate that, according to the table fixed by this association, if the money were honestly handled each borrowing stockholder would pay upon his stock and his loan sufficient in the seventy-two payments or six years' time to pay his stock in full, with over seven per cent interest, and it is quite apparent that the fund that was designated as a reserve fund, and the numerous extra fees and charges for membership, transfer, etc., were deemed the individual perquisites and benefits of the persons in control of and operating the union.

It is also insisted by appellant that the provision that the stock should mature in six years was *ultra vires,* and falls within the rule announced in *King* v. *International Building, Loan and Investment Union,* 170 Ill. 135. It has already been said, and may be repeated, that while the provision of the by-law declaring that the stock should be matured and paid in six years, in seventy-two payments, was contrary to the spirit of such association, it was not contrary to any statutory provision at the time it was passed or at the

time either of the loans in question was made to Linke. The act of 1879, (sec. 6,) with reference to the shares of stock, provided: "The shares of stock shall be $100 each, and shall be deemed personal property transferable upon the books of the company in such manner as may be provided by the by-laws, and subscriptions therefor shall be made payable to the corporation, and shall be payable in such periodical install-ments and at such time or times as shall be determined by the charter and by-laws; but no periodical payment to be made exceeding two dollars on each share." The foregoing was the only provision in the statute with reference to the issu-ance of shares of stock, their denomination, their series or the time or manner of payment, until the amendatory act of 1897, (Laws of 1897, p. 168,) when the above section was amended as section 6a, and reads as follows: "The capital to be accumulated shall be divided into shares having a ma-turity value of $100 each. The shares shall be deemed to be personal property in the hands of the members, transfer-able upon the books of the association in the manner pro-vided in the by-laws. The shares may be issued in such periodical series, and at such time or times as the by-laws shall designate; and the shares in each series may, if the by-laws shall so provide, be subdivided into classes, each class having a different fixed periodical payment of dues of not to exceed the sum of two dollars per share per month. * * * The payment of such dues shall continue on each share until the same shall have reached maturity value, or is withdrawn or retired."

The last sentence of the above section is the one upon which appellant relies and upon which the *King case, supra,* was predicated. But it is apparent that that section can have no application to the case at bar, for the reason that not only had the money been borrowed and the stock issued before its enactment, but all the payments required under the by-laws and the note and mortgage to mature the stock and re-pay the loan had been made and the release demanded, and the

contract, so far as the borrower or those claiming under him were concerned, had been fully performed and suit brought by the union to foreclose the mortgage, pending which, at the suit of the State Auditor, the union was dissolved and its assets disposed of.

So far as appeared upon the face of this contract it was within the charter powers of the union. It was not prohibited by law and cannot be said to be *malum in se.* It was fully performed, nothing remaining to be done by the union except to release the property. All the money that had been obtained under it had been re-paid, with interest within a fraction of a cent as high as might be contracted for under our statute. To this method of doing business every stockholder was committed by his contract of membership and certificate of stock, and the record shows that clear up to and after the time appellee Heiden had made his last payments, other loans and shares of stock were not only declared matured, but paid upon the same basis. It would seem that the plainest principles of justice and equity should estop this union from now saying that although it designedly and knowingly and with the consent of its members entered into the contract and it was fully performed, it was *ultra vires,* and that the law should step in and make another and different contract for the parties, and that the appellee Heiden, or his grantors, should be held to pay $7000 more on the loan. (*International Building and Loan Ass.* v. *Bratton,* 56 N. E. Rep. 105; *Vought* v. *Eastern Building and Loan Ass.* 172 N. Y. 508; *Brennan* v. *Gallagher,* 199 Ill. 207.) Appellant can stand in no different relation to this transaction than did the union.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*